Jason P. Gonzalez (SBN 178768)
jgonzalez@nixonpeabody.com
Neal J. Gauger (SBN 293161)
ngauger@nixonpeabody.com
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
Tel: 213-629-6000
Fax: 213-629-6001

Attorneys for Defendant
Thomas Bishop

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>     vs.<br><br>THOMAS BISHOP,<br><br>                     Defendant. | Case No. 4:14-cr-00001-PJH<br><br>**DEFENDANT TOM BISHOP'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION** |

4821-9098-8369.3

# Table of Contents

**Page**

I. INTRODUCTION ........................................................................................... 1

II. FACTUAL BACKGROUND ........................................................................ 2

III. PLEA AND COOPERATION HISTORY ................................................... 5

IV. MR. BISHOP'S PRESENT AND FUTURE CONDUCT ........................... 6

V. CONTROLLING LAW ................................................................................ 7

VI. ARGUMENT ............................................................................................... 8

    A. Sentencing Guidelines Calculation ........................................................ 8
    B. A Downward Departure is Warranted Under U.S.S.G. § 5K1.1 ............. 9
    C. A Downward Departure is Warranted Under 18 U.S.C. § 3553(a) ....... 10

        a. A Downward Departure is Warranted Due to Mr. Bishop's Cooperation Independent of His Section 5K1.1 Reduction .................... 11
        b. A Downward Departure Will Avoid Unwarranted Sentence Disparities, Satisfy the Seriousness of the Crime, Promote Respect for the Law, and Provide Just Punishment ......................................... 11
        c. A Downward Departure Will Afford Adequate Deterrence, Sufficiently Protect the Public From Further Crimes By Mr. Bishop, and Provide Correctional Treatment ................................................. 13
        d. A Downward Departure is Needed Because Mr. Bishop's Volume of Commerce Does Not Accurately Represent Mr. Bishop's Involvement .. 14
        e. A Downward Departure is Warranted Based Upon Mr. Bishop's Characteristics and as Mr. Bishop's Conduct in the Bid-Rigging Conspiracy Was Aberrant Behavior ........................................... 15

    D. Incarcerating Mr. Bishop Endangers His Family's Welfare and Increases the Chances, If Any, That He Will Engage In Recidivism ......................................... 16

VII. CONCLUSION ........................................................................................... 17

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Gall v. United States*,
5
   552 U.S. 38 (2007).............................................................................................. 8

6

*Koon v. United States*,
7
   518 U.S. 81 (1996).............................................................................................. 7

8

*Nelson v. United States*,
9
   555 U.S. 350 (2009) ............................................................................................ 8

10

*United States v. Booker*,
   543 U.S. 220 (2005) ............................................................................................ 7

11

*Wade v. United States*,
12
   504 U.S. 181 (1992) .......................................................................................... 10

13

*United States v. Denardi*,
14
   892 F.2d 269 (3d Cir. 1989) ................................................................................ 8

15

*United States v. Hadash*,
16
   408 F.3d 1080 (8th Cir. 2005)....................................................................... 15,16

17

*United States v. Howe*,
18
   543 F.3d 128 (3rd Cir. 2008).............................................................................. 15

19

*United States v. Ressam*,
20
   679 F.3d 1069 (9th Cir. 2012)............................................................................ 11

21

*United States v. Smith*,
   683 F. 2d 1236 (9th Cir. 1982) ........................................................................... 14

22

*United States v. Adelson*,
23
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................................. 8

24

**FEDERAL STATUTES**

25

15 U.S.C. § 1 .............................................................................................. 1, 5, 6, 8
26

18 U.S.C. § 3553 ................................................................................................ passim
27

28

4821-9098-8369.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18 U.S.C. § 1349 ................................................................................................ 5

U.S.S.G. § 2R1.1 ..................................................................................... 8, 9, 14

U.S.S.G. § 5K1.1 ......................................................................................... passim

U.S.S.G § 5K2.20 ............................................................................................ 15

U.S.S.G § 3E1.1 ................................................................................................. 9

**OTHER AUTHORITIES**

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:
   Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT
   RESOL. 421 (2007) .................................................................................... 17

Wayne A. Logan, *Informal Collateral Consequences*, 88 WASH. LAW
   REV. 1103 (2013) ...................................................................................... 14

Pew Report, *One in One Hundred: Behind Bars in America 2008* (2008) ............... 16

United States Sentencing Commission, Staff Discussion Paper, *Sentencing
   Options Under the Guidelines* (1996) ......................................................... 17

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty
   vs. Severity of Punishment*, The Sentencing Project (2010) .................................. 17

1

## I.      **INTRODUCTION**

2          Both the United States and other defendants in this matter agree – Defendant

3   Tom Bishop ("Mr. Bishop") played a small, secondary role in the bid-rigging

4   conspiracy at issue in this matter.  Nevertheless, Mr. Bishop deeply regrets this

5   role, a blemish on an otherwise law-abiding and honest life.  Mr. Bishop has pled

6   guilty to bid rigging in violation of 15 U.S.C. § 1, accepted responsibility for his

7   actions, and has gone above and beyond to provide critical cooperation to the

8   government's investigation and prosecution of other individuals.  Specifically, Mr.

9   Bishop has testified at the trials of two other defendants engaged in bid-rigging

10  activities, was prepared to testify at a third trial, and has even provided essential

11  information and assistance to investigators regarding an unrelated real estate

12  scheme.  For these and other reasons discussed below, a substantial departure and

13  variance from the Sentencing Guidelines is appropriate.

14         First, at all times relevant to this matter, Mr. Bishop was an employee acting

15  at the direction of his uncle, Rudolph Silva, Jr. ("Mr. Silva"), a defendant in this

16  action and the President of the Spencer David Company, Inc. ("SDC").  *United*

17  *States v. Silva*, Case No. 4:14-cr-00002-PJH, Dkt. No. 39, "United States'

18  Sentencing Memorandum and Motion for Downward Departure Pursuant to

19  U.S.S.G. § 5K1.1" ("DOJ Silva Sentencing Memorandum"), p. 2.  It is undisputed

20  that Mr. Silva served as the "primary decision maker" for the SDC, that he

21  "directed" Mr. Bishop on how to bid at real estate auctions, and that he "provided

22  the capital" for Mr. Bishop's purchase of properties.  *Id.*  Mr. Bishop violated the

23  law through the instruction and with the "approval" of Mr. Silva.  *Id.*  Mr. Bishop's

24  payment by Mr. Silva in commissions, as opposed to salary, does not influence this

25  analysis.

26         Second, Mr. Bishop pled guilty early in this matter, immediately accepted

27  responsibility for his actions, and provided "important" cooperation, key

28  information, and substantial assistance to the government, including but not limited

1  to trial testimony that lead to the conviction of defendants Thomas Joyce and Glenn

2  Guillory. *Id.*, p. 4. Mr. Bishop also met with federal investigators and assisted with

3  the prosecution of an unrelated real estate fraud scheme.

4      Third, other defendants in this matter – including Mr. Silva, who was

5  sentenced to three years of probation – have received substantial departures and

6  variances from the Sentencing Guidelines.[1] Mr. Bishop's role as an employee, his

7  relatively low volume of commerce, and the SDC's primary function of purchasing

8  and fixing up properties (rather than receiving payoffs for not bidding) strongly

9  support a sentence of probation here.

10     Fourth, Mr. Bishop is a young man with no prior criminal history, has

11 performed perfectly on pretrial release, and has fully cooperated in all aspects of

12 this investigation and prosecution. He is committed to raising his children,

13 supporting his family, and ensuring his mistakes are never repeated again.

14     In light of these and other factors, Mr. Bishop should be given a sentence of

15 one year of probation with a condition of 100 hours of community service.

16 **II.    FACTUAL BACKGROUND**

17     Mr. Bishop's family has a long history in the real estate industry. His

18 grandfather, Rudolph Silva, Sr. (Mr. Silva's father) worked in real estate, and as a

19 young man, Mr. Bishop occasionally "tagged along" to observe his grandfather "on

20 the job." While observing his grandfather, Mr. Bishop occasionally saw what he

21 now recognizes as bid rigging. Mr. Bishop later attended the University of

22 Washington, graduating with a degree in business in 2003. Following the death of

23 Mr. Bishop's grandfather in 2005, Mr. Bishop then approached Mr. Silva about

24 working for the SDC. During his first year as an SDC employee, Mr. Bishop

25

26 [1] Notably, Mr. Silva received a sentence of probation despite having deleted and/or altered the financial records of the SDC prior to their production to the

27 government. *Id.*, p. 2. Mr. Silva's knowing and willful attempt to hide his wrongdoing – an act that Mr. Bishop did not participate in – lead to Mr. Silva

28 receiving a two-level increase under the Guidelines for obstruction of justice.

apprenticed under his uncle, learning about the home foreclosure process, how liens are applied to properties, and how to value and rehabilitate homes for resale.

When Mr. Bishop first started working for Mr. Silva at the SDC, bid rigging remained rare. From 2005 to 2008, Mr. Bishop estimates that he witnessed roughly two or three bid rigging incidents per year. When he asked Mr. Silva about the practice, he was told that "some bidders just want a pay day," and that bid rigging was, at times, "the cost of doing business."

Mr. Bishop witnessed a severe and sudden increase in bid rigging activity around 2009. Mr. Bishop attributes this to the national housing crisis and financial downturn; by Mr. Bishop's estimate, the average number of auctioned properties in Contra Costa County rose from three per week to as high as fifty per week. This flood of foreclosed properties on the market attracted an increased number of participants at local housing auctions, many of whom promoted and engaged in bid rigging practices.

The bid rigging at issue involved agreements between auction participants about who would bid for properties at public auctions and at what price. After a public auction was completed, participants in the bid rigging conspiracy held "second auctions," which would determine the property's ultimate owner. Because bid rigging participants wished to purchase houses at a discounted price (thereby increasing their potential profit margins), the price of the foreclosed properties at the public auction was significantly lower than it should have been – specifically, the difference between the public auction price and the "second auction" price became ill-gotten gains for bid rigging participants.

Mr. Bishop's participation in the bid rigging conspiracy would not have occurred but for Mr. Silva's invitation and influence. DOJ Silva Sentencing Memorandum, Dkt. No. 39, p. 5 ("Silva also brought his nephew into the conspiracy"). Moreover, the United States agrees that Mr. Bishop's actions were

controlled, directed, and pre-determined by Mr. Silva.  From the United States'
sentencing brief concerning Mr. Silva:

> "In 2005 or early 2006, Silva hired his nephew, codefendant
> Thomas Bishop, to assist Silva with buying, fixing, and
> reselling property . . . Silva and Bishop attended trustee sales
> together from 2008 through mid-2009.  Later in 2009 and
> during 2010, Silva worked out of his house while Bishop
> attended the trustee sales.  Initially Silva was on the phone with
> Bishop during the auctions directing him on how much to bid.
> As Bishop became more experienced, Silva instructed Bishop
> to bid until their predetermined maximum bid limit and then to
> call Silva to discuss and make a decision.  Silva was the
> primary decision-maker as he provided the capital to purchase
> the properties.  When Silva attended the trustee sales, he
> personally participated in rounds and payoff agreements.  When
> Bishop was attending the auctions alone, he would usually call
> Silva to get approval to participate in the round or payoff deal."

*Id.*, p. 2.

Mr. Bishop's account of the bid rigging process matches that of the United
States.  When Mr. Bishop attended public auctions, he did so with a phone at his
ear, listening for Mr. Silva to direct how and when he should bid.  When Mr. Silva
was unavailable (and later, as Mr. Bishop became more familiar with the auction
process), Mr. Silva would supply Mr. Bishop with explicit directions and limits on
how to bid prior to the auction.  This absolute control over Mr. Bishop's actions can
be explained not only by Mr. Bishop's lack of experience, but also by the fact that
Ms. Silva supplied the capital for Mr. Bishop's bids.

Not only was Mr. Bishop's bid rigging performed entirely at Mr. Silva's
behest and direction; such actions represented a small percentage of the total
number of legitimate auctions he participated in.  During the three-year period in
which Mr. Bishop participated in the conspiracy, Mr. Bishop was implicated in the
sale of seventeen "rigged" properties sold at auction.  Of those seventeen
properties, Mr. Bishop purchased six properties, doing so on behalf and at the

behest of Mr. Silva.  The minor nature of Mr. Bishop's participation becomes apparent when compared to the fifty or so properties auctioned each week in Contra Costa County at the peak of the bid rigging conspiracy, and when the small amount of money Mr. Bishop made from bid rigging is compared to the total amount of money he made from the SDC's legitimate activities.  This is further reflected in Mr. Bishop's Volume of Commerce, set at $1,118,443, as well as the government's total restitution recommendation for Mr. Bishop, which has been set at $11,079.60.

## III.   PLEA AND COOPERATION HISTORY

Mr. Bishop was initially interviewed by the FBI on January 11, 2011.  Unlike other defendants under investigation, Mr. Bishop immediately admitted to participating in the bid-rigging conspiracy, and offered his cooperation and assistance to the Government.  Mr. Bishop also moved quickly to accept responsibility and plead guilty.  On January 2, 2014, a two-count Information was filed against Mr. Bishop.  Count One charged bid rigging in Contra Costa County, in violation of 15 U.S.C. § 1.  Dkt. No. 1.  Count Two charged conspiracy to commit mail fraud in Contra Costa County, in violation of 18 U.S.C. § 1349.  *Id.* Mr. Bishop pled guilty to both counts on February 26, 2014, doing so prior to indictment.  Dkt. No. 8.  On November 2, 2016, at the Government's behest, Mr. Bishop's count for violation of 18 U.S.C. § 1349 was dismissed.

Concurrent with his quick acceptance of responsibility, Mr. Bishop provided substantially valuable cooperation and information regarding other defendants in the case.  This information included (but was not limited to) identification of individuals involved in the bid-rigging conspiracy, the extent of those individuals' participation, and other facts that substantially supported and furthered the Government's ability to prosecute other defendants in this matter.  In addition to interviews with investigators and prosecutors, Mr. Bishop took the stand and provided useful testimony at the trials of Thomas Joyce and Glenn Guillory.  Due in part to Mr. Bishop's testimony, Mr. Joyce and Mr. Guillory were each sentenced

to violations of 15 U.S.C. § 1.  Mr. Joyce was sentenced to twelve months and one day in federal custody; Mr. Guillory was sentenced to eighteen months in federal custody.  *United States v. Joyce*, Case No. 4:14-cr-00607-PJH-4, Dkt. No. 323; *United States v. Guillory*, Case No. 4:14-cr-00607-PJH-3, Dkt. No. 337.  Both men were also given a supervised release term of three years.  *Id.*  Mr. Bishop further volunteered to provide testimony at a third trial, but his assistance was ultimately not required.

In addition to his cooperation in this investigation, Mr. Bishop provided substantial and repeated assistance to an unrelated FBI investigation regarding allegations of fraudulent real estate "short sales."  Mr. Bishop met and spoke with the FBI on multiple occasions, during which he provided his opinion and guidance to investigators.  Specifically, among other tasks, Mr. Bishop analyzed evidence and performed real estate valuations and appraisals on properties related to the alleged fraud.  In doing so, Mr. Bishop provided a valuable service as an *ad hoc* real estate expert for the FBI, and did so at his own cost and through the use of his own time.  Mr. Bishop's wife, Andrea Bishop, who is a realtor, also provided valuable information and analysis in support of the FBI's investigation.

## IV.   MR. BISHOP'S PRESENT AND FUTURE CONDUCT

Over nearly four years of pretrial release, Mr. Bishop has performed with full compliance.  Mr. Bishop's primary focus is on raising his three children, who are ages one, three, and six years old.  He is supporting them through operation of an independent business dedicated to property rehabilitation and resale.  Mr. Bishop's business also supports the livelihood of six other individuals who work for him on rehabilitation projects.  He and his wife Andrea enjoy a close and supportive relationship, and are dedicated to each other, their children, and their future.

Mr. Bishop severely regrets his actions.  He is a young man with no prior criminal history, and he does not present a significant risk of recidivism.  Mr. Bishop will carry the shame and personal failure of his actions in the bid-rigging

conspiracy for the rest of his life, and he is committed to living an honest and lawful life.  In addition to his personal humiliation, Mr. Bishop has already suffered consequences for his crimes.  Having pled guilty to a felony, Mr. Bishop's potential employment opportunities are severely limited.  His conviction will limit his ability to secure loans (and thus to purchase a home for his family) and to purchase life insurance.  Mr. Bishop will feel the effects of his crime for the rest of his life, and for far longer than other, older defendants convicted in this case.  Mr. Bishop wishes only to care for his family and to be an honest and trustworthy person.

## V.   CONTROLLING LAW

Under *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court must fashion a sentence that is sufficient, but not greater than necessary, to further the purposes of sentencing found in 18 U.S.C. § 3553.  These purposes include, but are not limited to, ensuring that the defendant's sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, protects the public from further crimes of the defendant, and provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  Any sentence issued should also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and must take into account that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  *Id.* §§ 3553(a)(6), 3582(a).

Under *Booker*, the Federal Sentencing Guidelines are merely advisory, and must be weighed alongside other sentencing factors.  543 U.S. at 259.  Where the Guidelines conflict with other sentencing factors, those other factors should control, and the Guidelines "place essentially no limit on the number of potential factors that may warrant a departure."  *Koon v. United States*, 518 U.S. 81, 106 (1996); *see also United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J,

concurring in part, dissenting in part) (sentences must meet the section 3553 purposes of retribution, deterrence, incapacitation, and rehabilitation, and imposition of a sentence greater than necessary to meet those purposes is reversible error, even if within guideline range); *see also Gall v. United States*, 552 U.S. 38 (2007) ("[F]ailing to consider the [18 U.S.C.] § 3553(a) factors" is a "significant procedural error"). *Id.* at 51. Courts have also recognized that the Guidelines must not be allowed to override common sense and basic fairness. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "[t]he utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense.").

Thus, a sentencing court must exercise independent judgment, and may not presume that the Guidelines are reasonable. *Gall*, 552 U.S. at 50 (a sentencing court "may not presume that the Guidelines range is reasonable"); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

## VI.   ARGUMENT

### A.   Sentencing Guidelines Calculation

Mr. Bishop concurs with the following Sentencing Guidelines Calculations:

- **Base Offense Level.** A violation of 15 U.S.C. § 1 carries a base offense level of 12. U.S.S.G. § 2R1.1(a).
- **Specific Offense Characteristics.** Mr. Bishop's offense involved an agreement to submit non-competitive bids, which creates a one-level increase pursuant to U.S.S.G. § 2R1.1(b)(1).
- **Volume of Commerce.** Mr. Bishop has stipulated to a Volume of Commerce set at $1,118,443. Pursuant to U.S.S.G. § 2R1.1(b)(2)(A), where a bid-rigging offense involves a Volume of Commerce between $1,000,000 and $10,000,000, a two-level increase is applicable.

- **Victim Related Adjustment.** None.
- **Adjustment for Role in the Offense.** None.
- **Adjustment for Obstruction of Justice.** None. Mr. Bishop did not assist with or participate in Mr. Silva's obstruction.
- **Acceptance of Responsibility.** Mr. Bishop immediately accepted responsibility for his actions when interviewed by investigators in January 2011, and has continually cooperated and provided valuable assistance to the Government since then. Mr. Bishop's early acceptance of responsibility allowed the Government and this Court to avoid wasting resources in preparing for his trial, and ensured valuable resources were allocated to facilitate the efficient, fair, and effective prosecution and trial of other defendants. A two-level decrease is thus applicable. U.S.S.G § 3E1.1(a).
- **Criminal History Computation.** Mr. Bishop does not have any juvenile or adult criminal convictions, nor other criminal conduct, pending charges, or other arrests. His Criminal History Category is I.

In light of the above, the Guidelines range for Mr. Bishop's sentence is twelve to eighteen months (Level 13). However, as discussed below, a substantial downwards departure and variance from the Guidelines is warranted.

**B.** **A Downward Departure is Warranted Under U.S.S.G. § 5K1.1**

Pursuant to U.S.S.G. § 5K1.1, upon motion of the Government that a defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the Court may depart from the Guideline recommendation. In doing so, the Court should consider a list of factors, including but not limited to: (1) the Court's evaluation of the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or

1  risk of injury to the defendant or his family resulting from the assistance; and (5)

2  the timeliness of the defendant's assistance.  *Id.*  Even if the Government declines

3  to file a section 5K1.1 motion, the Court may still authorize a substantial assistance

4  departure from the Guidelines if the Government's refusal is based on an

5  unconstitutional motive.  *Wade v. United States*, 504 U.S. 181, 186 (1992).

6        Here, Mr. Bishop has presented a nearly unprecedented amount of

7  cooperation and assistance to the Government.  This assistance includes (but is not

8  limited to) his truthful, complete, and reliable testimony (which has lead to the

9  convictions of Thomas Joyce and Glenn Guillory), his offer to provide testimony at

10 additional trials, and his assistance with the FBI's investigation of an unrelated

11 "short sale" fraud.  This assistance has proven to be both significant and highly

12 useful to the Government in prosecuting other offenders.  While Mr. Bishop is

13 unaware of any immediate danger presented by his cooperation, he may be unaware

14 of currently pending danger posed by members of the broad bid-rigging conspiracy

15 about which he has testified.  Mr. Bishop's wife also provided assistance to the

16 FBI, raising the potential of danger for her and for Mr. Bishop's young children.

17 With respect to timeliness, Mr. Bishop accepted responsibility and began providing

18 assistance to the Government in January 2011, far earlier than other defendants.

19 Every factor contemplated by section 5K1.1 supports that Mr. Bishop should be

20 granted a substantial departure from the Guideline recommendation.

21     **C.**    **A Downward Departure is Warranted Under 18 U.S.C. § 3553(a)**

22       The factors and sentencing goals set forth in 18 U.S.C. § 3553 dictate that a

23 Guidelines range sentence for Mr. Bishop would be highly excessive.  Based upon

24 the below circumstances unique to Mr. Bishop, the Court should reduce Mr.

25 Bishop's sentence to one year of probation and 100 hours of community service.

26

27

28

DEFENDANT'S SENTENCING MEMORANDUM AND STATEMENT IN MITIGATION

### a. A Downward Departure is Warranted Due to Mr. Bishop's Cooperation Independent of His Section 5K1.1 Reduction

Apart from the Government's anticipated 5K1.1 motion, the Court may also consider Mr. Bishop's cooperation as part of its 18 U.S.C. section 3553 analysis. *United States v. Ressam*, 679 F.3d 1069, 1092 (9th Cir. 2012) ("Section 3553(a)(1) identifies "the history and characteristics of the defendant" as one of the factors to consider in imposing a sentence. That factor may include the defendant's cooperation with authorities."). As discussed above, Mr. Bishop's substantial cooperation and assistance within this matter and as part of the FBI's "short sale" investigation supports a substantial sentence reduction under 18 U.S.C. § 3553 in addition to the anticipated departure he may receive pursuant to U.S.S.G. § 5K1.1.

### b. A Downward Departure Will Avoid Unwarranted Sentence Disparities, Satisfy the Seriousness of the Crime, Promote Respect for the Law, and Provide Just Punishment

In determining a defendant's sentence, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). To that end, this Court has already determined the range of just punishments for bid-rigging activities in this matter; the punishments provided to already-sentenced defendants should guide the analysis here.

Many cooperating defendants in this matter – including defendants with far greater and more egregious conduct than Mr. Bishop – have been sentenced to probation. For example, Mr. Silva received a sentence of three years of probation, with a condition of home confinement and $23,576.75 in restitution, despite "directing" and "instruct[ing]" Mr. Bishop's participation in the bid-rigging conspiracy, stipulating to a Volume of Commerce in the amount of $4,063,024, and engaging in obstruction of justice through destruction of records related to the

investigation.  Case No. 4:14-cr-00002-PJH, Dkt. No. 38, p. 7, Dkt. No. 40, p. 2-5.
*See also United States v. Wan*, Case No. 4:14-cr-00604-PJH, Dkt. No. 33, p. 3-5,
Dkt. No. 34, p. 1 (sentencing defendant Garry Wan to three years of probation
despite participating in one hundred and eighty-four rigged auctions and
accumulating a Volume of Commerce in excess of ten million dollars); *see also*
*United States v. Galvez*, 4:13-cr-00414-PJH, Dkt. No. 41, p. 2-4, Dkt. No. 42, p. 1
(sentencing defendant Irma Galvez to three years of probation despite her lying
about the bid-rigging conspiracy during an FBI interview, and despite her
cooperation failing to result in "any new investigative leads or the discovery of new
evidence").

        While Mr. Silva, Mr. Wan, and Ms. Galvez each provided cooperation to the
government, none of these defendants provided testimony at two trials, much less
additional support to an unrelated FBI investigation.  Moreover, each of these
defendants had either a substantially larger Volume of Commerce (Mr. Silva and
Mr. Wan) or engaged in misconduct during the pendency of the bid-rigging
investigation (Mr. Silva and Ms. Galvez).  Even defendants who have exercised
their right to trial have been given somewhat lenient sentences, ranging from
twenty-one months (Alvin Florida. Jr.) to as low as eight months (Refugio Diaz).
*See United States v. Florida*, Case No. 4:14-cr-00582-JD-1, Dkt. No. 498; *United*
*States v. Diaz*, 4:14-cr-00582-JD-4, Dkt. No. 458.

        The prosecution of defendant Thomas Franciose also provides guidance as to
Mr. Bishop's appropriate sentence.  Like Mr. Bishop, Mr. Franciose admitted guilt
early in the investigation, has a similarly low Volume of Commerce ($998,600),
and provided cooperation to the Government that included testimony at trial.
*United States v. Franciose*, Case No. 4:11-cr-0426-PJH, Dkt. No. 50, p. 1, 3, 6.
Accordingly, Mr. Franciose's Guideline offense level was set at 11.[2]

---

[2] Because Mr. Franciose's Volume of Commerce was set at $998,600, Mr.
Franciose avoided the two-level Guideline increase received by Mr. Bishop for
falling within the $1,000,000 to $10,000,000 range.   If Mr. Franciose's Volume

1    Unlike Mr. Bishop, however, Mr. Franciose "initially denied knowledge and

2    participation in rounds" when interviewed by the FBI, was "not an employee" of

3    other bid-rigging participants, and had his restitution amount set at $19,983 – nearly

4    $9,000 higher than that of Mr. Bishop. *Id.* at Dkt. No. 49, p. 1-2; Dkt. No. 50, p. 2.

5    With these factors in mind, the Court sentenced Mr. Franciose to three years of

6    probation without mandating a condition of home confinement. *See id.*, Dkt.

7    No. 51, p. 1 and Dkt. No. 52, p. 4 ("Special Conditions of Supervision").

8    The Court provides its own guidance:  Mr. Bishop should receive a sentence

9    even more favorable than that of Mr. Franciose, particularly in light of Mr.

10   Bishop's far greater cooperation and assistance to the Government, his status as an

11   employee of Mr. Silva, his similar Volume of Commerce, and the forthright nature

12   of his interactions with investigators.  A sentence of probation without home

13   confinement will satisfy the seriousness of Mr. Bishop's crime, promote respect for

14   the law, and provide a just punishment.

15           c.    **A Downward Departure Will Afford Adequate Deterrence,**

16                 **Sufficiently Protect the Public From Further Crimes By Mr.**

17                 **Bishop, and Provide Correctional Treatment**

18   Imprisonment is not necessary to deter Mr. Bishop from committing a future

19   offense against the public.  Apart from Mr. Bishop's lack of prior criminal

20   behavior, Mr. Bishop's bid rigging was committed in a context that is highly

21   unlikely to be repeated.  Mr. Bishop also immediately halted his criminal activity

22   after being questioned by the FBI in January 2011, demonstrating that he

23   understands the gravity of his crime and that he has already been sufficiently

24   deterred from committing future criminal acts.  Since January 2011, Mr. Bishop has

25   continued to operate in the real estate field and has done so without incident or

26

27

28   had been set a mere $1,400 higher, he and Mr. Bishop would have received the
     same Guideline offense level designation.

unlawful activity.  Because he is acutely aware of the consequences for unlawful acts in the real estate field, Mr. Bishop has already received the correctional treatment necessary to ensure his business practices are executed ethically.

As discussed in Section IV, *supra*, Mr. Bishop has already suffered severe consequences from his offense, including limitations on his employability, ability to secure loans, and ability to purchase life insurance.  Should Mr. Bishop commit future crimes, he would no longer benefit from a Criminal History categorization of Level I.  Mr. Bishop's status as a felon creates sufficient deterrence in itself, and incarceration is not necessary.  *United States v. Smith*, 683 F. 2d 1236, 1240 n.13 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, *Informal Collateral Consequences*, 88 WASH. LAW REV. 1103, 1106 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

> ### d.    A Downward Departure is Needed Because Mr. Bishop's Volume of Commerce Does Not Accurately Represent Mr. Bishop's Involvement

As discussed above, where a bid-rigging offense involves a Volume of Commerce between $1,000,000 and $10,000,000, a two-level increase is applicable. U.S.S.G. § 2R1.1(b)(2)(A).  Here, Mr. Bishop's stipulated Volume of Commerce is $1,118,443, dictating a two-level Guideline increase.  Notably, this is the exact same two-level increase received by Mr. Silva, despite Mr. Silva's Volume of Commerce being set at $4,063,024 – nearly four times as high as Mr. Bishop.  Mr. Bishop's substantially lower Volume of Commerce, as well as the fact that his Volume was incurred in his role as Mr. Silva's employee, is not accounted for by the Guidelines.  Thus, this Court should make an appropriate downward departure to Mr. Bishop's sentence in order to account for this disparity (as well as the disparity between the Guideline offense levels issued to Mr. Bishop and Mr.

Franciose) and the nature of Mr. Bishop's conduct being performed at Mr. Silva's behest.  The Court should also account for the increase in Mr. Bishop's Volume of Commerce created by the inflated value of homes in Contra Costa County, California, an affluent region of the United States.  Had Mr. Bishop engaged in bid-rigging in another geographic region of the United States, his Volume of Commerce would likely be far lower.  The mere location of Mr. Bishop's conduct – a location which he did not select – does not justify a sentence that is disproportionate to bid-rigging defendants in other regions of the United States.

 **e.** **A Downward Departure is Warranted Based Upon Mr. Bishop's Characteristics and as Mr. Bishop's Conduct in the Bid-Rigging Conspiracy Was Aberrant Behavior**

 In addition to the mechanisms of U.S.S.G. § 5K1.1. and 18 U.S.C. § 3553, a Court may consider whether a defendant's conduct constituted "aberrant" behavior; if so, it may issue a further departure from the defendant's Guideline sentence.  U.S.S.G § 5K2.20.  As articulated by section 5K2.20, aberrant behavior is generally conceived to be "a single criminal occurrence or single criminal transaction," committed "without significant planning," over a limited duration," and "represent[ing] a marked deviation by the defendant from an otherwise law-abiding life."

 Mr. Bishop's conduct within the bid-rigging conspiracy was abhorrent behavior.  While he participated in more than one bid-rigging "round," Mr. Bishop's limited involvement in executing Mr. Silva's directions (rather than Mr. Bishop's independent "planning" of criminal acts), is a decidedly marked deviation from Mr. Bishop's law-abiding life as the father of three young children and as a valuable member of his community.  *United States v. Howe*, 543 F.3d 128, 132 (3rd Cir. 2008) (affirming probation on a sentence of two counts of wire fraud, as the defendant's crimes were an "isolated mistake . . . albeit an extraordinarily serious

one"); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (affirming probation for stealing semi-automatic handguns as the defendant was a "law abiding citizen, who [did] an incredibly dumb thing").

Mr. Bishop's participation in the bid-rigging conspiracy was a catastrophic mistake, and one in decided contrast with the ethics and morality that has governed him and has been expressed through his regular conduct as a husband, father, and businessman.  Mr. Bishop has avoided criminal acts before the bid-rigging conspiracy, has performed perfectly during nearly four years of pre-trial release, and poses no significant risk of engaging in future criminality.  His participation in the bid-rigging conspiracy should be viewed as aberrant behavior, and he should be granted a further downward departure from the Guidelines as a result.

**D.      Incarcerating Mr. Bishop Endangers His Family's Welfare and Increases the Chances, If Any, That He Will Engage In Recidivism**

If Mr. Bishop is incarcerated, his wife Andrea and their three very young children will suffer a severe and negative impact to their economic and social standing.  "[F]or many low-risk offenders," incarceration "inflicts economic hardship in many, less obvious ways.  If they have a job at all, prisoners are typically unable to earn more than a very low wage, making it unlikely they will pay much, if anything, in child support, victim restitution, or taxes."   Pew Report, *One in One Hundred: Behind Bars in America 2008* (2008) at p. 13.  Mr. Bishop's ability to provide for his family while in prison would be severely impacted both during and after his sentence is served.  While incarcerated, Mr. Bishop is unlikely to have access to any meaningful wages; upon release, he will suffer a negative impact to his ability to resume operating his business and to recover its goodwill. While Andrea Bishop is also employed as a realtor, her salary alone is insufficient to support the Bishop family.  Incarcerating Mr. Bishop also creates a high risk that his children will suffer social exclusion from their peers; other families in the

1  community may not want to associate with the Bishops, thereby limiting and

2  damaging the children's social growth and welfare.

3       While Mr. Bishop poses an extremely low chance of recidivism, what small

4  chance exists would necessarily be increased by incarceration.  Studies have shown

5  that particularly among low-risk offenders, prison time leads to a greater risk of

6  recidivism due to the loss of "pro-social contacts in the community," and

7  "legitimate opportunities."  *See*, *e.g.*, Valerie Wright, Ph.D., *Deterrence in Criminal*

8  *Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, at

9  p. 7 (2010); *see also* United States Sentencing Commission, Staff Discussion Paper,

10  *Sentencing Options Under the Guidelines* (1996) (recognizing the "criminogenic

11  effects of imprisonment which include contact with more serious offenders,

12  disruption of legal employment, and weakening of family ties").  Other studies have

13  shown that an increase in sentence length does not correlate with an increase in

14  deterrence, particularly in white collar cases.  *See, e.g.*, Zvi D. Gabbay, *Exploring*

15  *the Limits of the Restorative Justice Paradigm: Restorative Justice and White*

16  *Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[T]here is no

17  decisive evidence to support the conclusion that harsh sentences actually have a

18  general and specific deterrent effect on potential white-collar offenders.").

19       Incarcerating Mr. Bishop will do far more harm than good.  A punishment of

20  probation will be more than sufficient to punish Mr. Bishop while ensuring the

21  welfare of his family.  Moreover, a mandated condition that Mr. Bishop provide

22  100 hours of community service will ensure greater engagement between Mr.

23  Bishop's family and their community, rather than their exclusion from society.

## VII.  CONCLUSION

25       Mr. Bishop will carry the regret and shame of his crime for the rest of his

26  life.  He has failed to uphold ethical standards and will need to reconcile his actions

27  as he raises his children and attempts to set them on a moral path.  Incarcerating

28  Mr. Bishop would be an overly punitive and disproportionate act, and is

unwarranted in light of Mr. Bishop's limited criminal participation and substantial cooperation.  Mr. Bishop therefore respectfully requests that this Court provide him with a sentence of one year of probation and 100 hours of community service.

Dated:        November 22, 2017              NIXON PEABODY LLP


                                             By:*/s/ Jason P. Gonzalez*
                                                Jason P. Gonzalez
                                                Neal J. Gauger
                                                Attorneys for Defendant
                                                Thomas Bishop